UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TYQUAN STEWART *(bey)*, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | )    No. 1:16-cv-00316-SLC |
| | ) |
| G. HENSLER, *Police Officer*, *et al.*, | ) |
| | ) |
|     **Defendants.** | ) |

## OPINION AND ORDER

*Pro se* Plaintiff Tyquan Stewart (bey) ("Stewart") filed this 42 U.S.C. § 1983 suit against Defendants the City of Fort Wayne ("the City") and Fort Wayne Police Officers G. Hensler, T. Hughes, T. Strausborger, and G. Nicklow (together, "the Officers"), after a traffic stop on June 28, 2016, of a vehicle in which Stewart was a passenger. (DE 1). During the stop, the occupants were asked to exit the vehicle, and Stewart was frisked for weapons and issued a citation for a violation of Indiana's open-container law.[1] In his operative complaint[2] (DE 73), Stewart sues the Officers for false arrest in violation of his rights under the Fourth Amendment and Indiana law, and he seeks to also hold the City liable for the alleged false arrest under a theory of *respondeat superior*. Stewart further alleges in his complaint that during the traffic stop he was discriminated against based on his religion (DE 73 at 2-3), and in his motion for summary judgment, he claims discrimination based on his race and gender as well (DE 104-1 at 4).

On November 19, 2018, Defendants filed a motion for summary judgment, together with

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 22).

[2] Stewart amended his complaint five times, most recently, on June 4, 2018. (DE 1; DE 4; DE 8; DE 12; DE 54; DE 73).

a supporting brief and exhibits, seeking judgment as a matter of law in their favor on all of Stewart's claims. (DE 100; DE 101). In lieu of filing a response to Defendants' summary judgment motion, Stewart filed his own motion for summary judgment on November 26, 2018, together with a supporting memorandum and the squad car and body camera videos of the incident,[3] claiming that he is entitled to judgment in his favor on all claims. (DE 104; DE 105; DE 106).

On November 28, 2018, Defendants moved to strike Stewart's motion for summary judgment on the basis that it was filed one week after the dispositive motions deadline.[4] (DE 107). On December 19, 2018, Stewart filed a "motion" in opposition to Defendants' motion to strike, which the Court deems to be a response brief to Defendants' motion to strike. (DE 108). On December 20, 2018, Defendants filed a reply brief to their motion to strike, and on December 21, 2018, Defendants filed a response brief to Stewart's motion for summary judgment. (DE 109; DE 110). Stewart has not filed a reply brief to his motion for summary judgment, and the time to do so has now passed. N.D. Ind. L.R. 7-1(d)(2)(B). Therefore, these matters are now ripe for adjudication.

For the following reasons, Defendants' motion for summary judgment will be GRANTED, and Stewart's motion for summary judgment will be DENIED.[5]

---

[3] Stewart states that he has never watched the videos, but that he does not need to, because the videos "should prove what [he is] saying is true." (DE 104-1 at 2).

[4] Discovery closed on October 15, 2018, and the dispositive motions deadline was November 18, 2018. (DE 89). Because November 18, 2018, was a Sunday, the dispositive motions deadline extended to November 19, 2018, pursuant to Federal Rule of Civil Procedure 6(a)(1)(C).

[5] Because Stewart's motion for summary judgment will be denied on the merits, the Court need not reach Defendants' motion to strike on the basis of untimeliness. Therefore, Defendants' motion to strike will be DENIED AS MOOT.

# I. FACTUAL BACKGROUND[6]

This case arises out of a traffic stop that occurred on June 28, 2016, in Fort Wayne, Indiana. (DE 100-1 at 2; DE 100-2 at 1; DE 100-3 at 1, ¶ 5). That day, Fort Wayne Police Officers Timothy Hughes ("Hughes") and George Nicklow ("Nicklow") were on duty in full police uniform and operating an unmarked police vehicle. (DE 100-3 at 1, ¶ 5). Officers Hughes and Nicklow observed a black Oldsmobile Bravada turn left from Turtle Creek Boulevard onto Paulding Road, which had two lanes of travel in each direction. (DE 100-3 at 1-2, ¶¶ 6, 7). The Officers further observed that when making the left turn, the Bravada traveled into the left-hand lane, and then proceeded through the left-hand lane into the right-hand lane of travel without signaling its lane change. (DE 100-3 at 2, ¶ 8).

The Bravada was being driven by Stewart's sister, Natasha Stewart ("Natasha"), and Stewart was sitting in the front-passenger seat; Stewart's brother, Antoan Stewart ("Antoan"), was sitting in the back seat of the Bravada. (DE 100-3 at 2, ¶¶ 10-11). Stewart admits that the Bravada traveled into the far right lane, but states that he was not paying enough attention at the time to know whether Natasha had signaled the lane change. (DE 100-1 at 18-19, Dep. 83-84).

After observing the Bravada change lanes without signaling, Officers Hughes and Nicklow initiated a traffic stop of the Bravada. (DE 100-3 at 2, ¶ 9). The Bravada then stopped

---

[6] Stewart failed to submit a statement of material facts in his cross-motion for summary judgment; nor did he cite to any evidence in his cross-motion. (*See* DE 104). While the Court construes all evidence in the light most favorable to the non-moving party when deciding summary judgment, *Xiong v. Wagner*, 700 F.3d 282, 288 (7th Cir. 2012); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), the Court "cannot consider evidentiary materials that are not properly before it," *Bodor v. Town of Lowell*, No. 2:05-CV-268, 2007 WL 1035085, at *7 (N.D. Ind. Mar. 28, 2007) (citing *Averhart v. Arrendondo*, 773 F.2d 919 (7th Cir. 1985)). That is, "[t]he Court simply cannot overlook the requirements of the federal rules of evidence or civil procedure, especially the requirements set for[th] in Federal Rule 56(e), when evaluating a *pro se* plaintiff's materials filed in opposition to a motion for summary judgment." *Bodor*, 2007 WL 1035085, at *7 (citing *Averhart*, 773 F.2d 919). Therefore, Defendants' statement of material facts is largely undisputed other than where, as noted, Stewart testified otherwise at his deposition.

in a nearby parking lot. (DE 100-3 at 2, ¶ 12).

After the Bravada stopped, Officer Nicklow approached the driver's side of the vehicle, and Officer Hughes approached the passenger's side. (DE 100-3 at 2, ¶ 12). Officer Hughes states that as he was approaching the vehicle, he saw Stewart making furtive movements. (DE 100-3 at 2, ¶ 13). Specifically, Officer Hughes states that he saw Stewart lean forward and reach underneath his seat as though he was attempting to hide something. (DE 100-3 at 2, ¶ 13). Stewart, however, denies that he reached for anything on the floorboard of the car. (DE 100-1 at 16-17, Dep. 80-81). Stewart testified, rather, that he just turned around to talk with Antoan because he knew there was a warrant out on Antoan and there was "a good possibility that [Antoan] was about to go to jail." (DE 100-1 at 16-17, Dep. 80-81). Stewart told Antoan that the family would try to come together to pay the amount necessary to get Antoan out, and Stewart then reached back to shake Antoan's hand and "that was it." (DE 100-1 at 16-17, Dep. 80-81).

Upon reaching the Bravada, Officers Hughes and Nicklow obtained identification from the vehicle's occupants. (DE 100-3 at 2, ¶ 14). When checking the identifications, Officers Hughes and Nicklow discovered that Antoan had two body attachments out for his arrest. (DE 100-3 at 2, ¶ 14). Antoan was removed from the vehicle, handcuffed, and placed in the back of the squad car. (DE 100-3 at 2, ¶ 14). The identifications also revealed that Stewart had alerts attached to his name that indicated he was a known resistor and that he had been denied a handgun permit. (DE 100-3 at 2, ¶ 15).

Officer Hughes grew increasingly concerned that the item Stewart appeared to have been hiding beneath his seat was a gun or other weapon. (DE 100-3 at 3, ¶ 16). Due to concerns for

4

officer safety, Officers Hughes and Nicklow asked Stewart to exit the vehicle, and Stewart was frisked for weapons.[7] (DE 100-3 at 3, ¶¶ 17, 18; DE 100-4 at 2, ¶¶ 8, 9). Natasha was not frisked. (DE 100-1 at 19, Dep. 83). Several officers then searched the areas of the Bravada in Stewart's immediate control for weapons. (DE 100-3 at 3, ¶ 19; DE 100-4 at 2, ¶ 10). Officer Hughes discovered a mostly-empty bottle of Bud Light under Stewart's seat and an open bottle of Hennessey in the center console. (DE 100-3 at 3, ¶ 19; DE 100-4 at 2, ¶ 10). The bottle of Bud Light was still cold and was located in the area where Stewart appeared to be reaching when Officer Hughes approached the Bravada. (DE 100-3 at 3, ¶ 20).

In interacting with Stewart, Officers Hughes and Nicklow smelled alcohol on Stewart's breath. (DE 100-3 at 3, ¶ 21; DE 100-4 at 2, ¶ 11). Accordingly, they administered a portable breathalyzer test ("PBT") to Stewart, but the device was not functioning properly. (DE 100-3 at 3, ¶ 22; DE 100-4 at 2, ¶ 12). Natasha was not given a PBT. (DE 100-1 at 19, Dep. 83). Stewart was then issued a citation for violation of Indiana's open-container law, Ind. Code § 9-30-15-3, and Natasha was given a citation for failure to signal lane change, a violation of Ind. Code § 9-21-8-25. (DE 100-3 at 3, ¶¶ 23, 24; DE 100-4 at 2, ¶ 13). After receiving the citations, Stewart and Natasha left the scene in the Bravada. (DE 100-3 at 3, ¶ 25; DE 100-4 at 2, ¶ 14).

In July 2016, Natasha entered a plea of admission to the citation for failure to signal lane change, a judgment was entered against her, and she paid the assessed fine. (DE 100-2 at 4). In September 2016, after a bench trial, the state court concluded that Stewart had violated Indiana's open-container law, and assessed him a fine of $35.50. (DE 100-1 at 4-5, Dep. 11-12).

---

[7] It was at about this time when Officer Gary Hensler arrived on the scene. (DE 100-4, ¶ 8).

## II. LEGAL STANDARD

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (citations omitted). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123

F.3d 456, 461 (7th Cir. 1997)); *see also M.O. v. Ind. Dep't of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *M.O.*, 635 F. Supp. 2d at 850 (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). That is, cross-motions for summary judgment do not alter each party's burdens in the summary judgment analysis; each responsive party must establish a triable issue of fact to defeat the moving party's cross-motion for summary judgment. *See M.O.*, 635 F. Supp. 2d at 850. The cross-motions are treated separately. *See George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 854 n.12 (N.D. Ill. 2011) (collecting cases).

## III. DISCUSSION

### A. § 1983 Fourth Amendment Claims Against the Officers

1. <u>The Initial Traffic Stop</u>

Stewart alleges § 1983 claims against the Officers for false arrest in violation of his Fourth Amendment rights. To prove a claim under § 1983, Stewart "must show two elements: (1) the party against whom the claim is brought qualifies as a person acting under the color of state law; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2015) (citations and internal quotation marks omitted). There appears to be no dispute that the Officers were acting under color of state law during the traffic stop.

Defendants argue instead that there was no violation of Stewart's rights, because Officers

Hughes and Nicklow had probable cause to stop the Bravada when they witnessed it changing lanes without signaling. "A traffic stop does not violate the Fourth Amendment when the police officer has probable cause to believe that a driver has committed even a minor violation of a traffic law." *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012) (citation omitted); *see also Whren v. United States*, 517 U.S. 806, 819 (1996). That is, "[t]he existence of probable cause bars a claim under § 1983 for false arrest, and the plaintiff carries the burden of establishing the absence of probable cause." *Larsen v. Elk Grove Vill., Ill.*, 433 F. App'x 470, 472 (7th Cir. 2011) (citations omitted); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("Probable cause acts as an absolute bar to a claim for false arrest." (citing *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010))).

Indiana Code § 9-21-8-25 provides that "[a] signal of intention to turn right or left shall be given continuously during not less than two hundred (200) feet traveled by a vehicle before turning or changing lanes." The Indiana Court of Appeals has held that this statute requires the use of a turn signal "even when turning from a parking lot onto a street or changing lanes." *Smith*, 668 F.3d at 431 (citing *Datzek v. State*, 838 N.E.2d 1149, 1155 (Ind. Ct. App. 2005)). Here, Stewart concedes that when turning onto Paulding Road, Natasha traveled into and through the left-hand lane of travel and then into the right-hand lane. (DE 100-1 at 18-19, Dep. 83-84). Stewart does not dispute Officer Hughes's statement that Natasha failed to signal when changing lanes. (DE 100-3 at 2, ¶ 8). Rather, Stewart testified that he was not paying enough attention to notice whether Natasha signaled before changing lanes. (DE 100-1 at 18-19, Dep. 83-84). As such, on this record, Officer Hughes's testimony that Natasha failed to signal before changing lanes is undisputed, which is fatal to Stewart's false arrest claim arising from the initial

8

traffic stop.[8] *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept [his] version of events." (citation and internal quotation marks omitted)).

For these reasons, there is no material factual dispute whether the Officers had probable cause to initiate the traffic stop, and in turn, the existence of probable cause bars Stewart's § 1983 false arrest claims arising from the initial traffic stop. Consequently, Defendants' motion for summary judgment as to Stewart's § 1983 false arrest claims arising from the initial traffic stop will be granted.

2. Requiring Plaintiff to Exit the Vehicle, the Frisk for Weapons, and the Search of the Vehicle

Stewart presumably is also challenging the Officers' ordering the occupants to exit the Bravada, the frisk of Stewart for weapons, and the search of the Bravada. However, once a vehicle has been subjected to a traffic stop, an officer may, for purposes of officer safety, order the driver and any other occupants out of the vehicle pending completion of the traffic stop, without violating the Fourth Amendment. *See Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (passengers); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (driver). An officer may also frisk an occupant of a vehicle for weapons during a traffic stop if the officer has a reasonable suspicion that the occupant subjected to the frisk is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009); *Mimms*, 434 U.S. at 111 (citing *Terry v. Ohio*, 392 U.S. 1

---

[8] Defendants also argue that under *Heck v. Humphrey*, 512 U.S. 477 (1994), Natasha's entry of a plea of admission to the traffic infraction bars Stewart's false arrest claim because it would necessarily imply the invalidity of Natasha's criminal conviction, and such conviction has not been vacated. Because on this record a reasonable jury could only conclude that the Officers had probable cause for the traffic stop, the Court finds it unnecessary to reach Defendants' additional argument.

(1968)). Similarly, an officer may search the passenger compartment of a vehicle, limited to those areas in which a weapon may be placed or hidden, if the officer "possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer[] in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

Here, as Officer Hughes approached the Bravada, he perceived that Stewart was making furtive movements and reaching under his seat as though he were hiding something. (DE 100-3 at 2, ¶ 13). While Stewart denies that he was concealing anything or reaching under his seat, he admits that he turned around to talk to Antoan and that he reached behind him to shake Antoan's hand. (DE 100-1 at 16-17, Dep. 80-81). Given Stewart's admission, a reasonable jury could only conclude that Officer Hughes's construing Stewart's movements as an act of placing or retrieving something, possibly a weapon, was reasonable. *See United States v. Arnold*, 388 F.3d 237, 240 (7th Cir. 2004) (finding that the officer had a reasonable suspicion that a motorist who made unusual movements into the back seat may have retrieved or concealed a weapon); *United States v. Fryer*, 974 F. 2d 813, 819 (7th Cir. 1992) (finding that an officer's observation of furtive movements between the driver and the passenger of a vehicle that the officer was trying to pull over, reasonably warranted searching the interior of the car); *United States v. Schlatter*, No. 109-CR-91-TS, 2010 WL 1568600, at *6 (N.D. Ind. Apr. 19, 2010) (finding that an officer had a reasonable suspicion that the driver was placing or retrieving something, possibly a weapon, where he saw the driver reach over to the middle console and passenger area of the car).

Furthermore, once Officers Hughes and Nicklow ran the occupants' identifications, they

learned that Antoan had two body attachments out for his arrest, and that Stewart had alerts attached to his name notifying officers that he was a known resistor and that he had been denied a handgun permit. *See United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) (stating that an officer checking the occupants' criminal histories on the officer's car computer is "a procedure permissible even without reasonable suspicion" (citations omitted)). After reasonably construing Stewart's movements as furtive when approaching the vehicle, this additional information about Stewart's criminal history reasonably heightened the Officers' concern for their safety during the traffic stop.

Therefore, on this record, no reasonable jury could conclude that the Officers' order for the occupants to exit the Bravada, the frisk of Stewart, and the search of the vehicle violated Stewart's Fourth Amendment rights.

### 3. The PBT and Citation for Violation of Indiana's Open-Container Law

Stewart also suggests that being subjected to a PBT and issued a citation for violation of Indiana's open-container law violated his Fourth Amendment rights. However, it is undisputed that in the search of the Bravada, Officer Hughes discovered a mostly-empty, still-cold bottle of Bud Light under Stewart's seat and an open bottle of Hennessey in the center console, which were in the area that Stewart appeared to be reaching when Officer Hughes approached the vehicle. (DE 100-3 at 3, ¶¶ 19, 20; DE 100-4 at 2, ¶ 10). Nor does Stewart dispute the testimony of Officers Hughes and Hensler that they smelled alcohol on Stewart's breath. (DE 100-3, ¶ 21; DE 100-4, ¶ 11). Stewart also testified that Antoan was not drinking in the vehicle. (DE 100-1 at 18, Dep. 18).

The odor of alcohol on Stewart's breath, the two open containers of alcohol within the

vehicle (one in the middle console and the other, still cold, directly under Stewart's seat), and Stewart's close proximity to such open containers provided the Officers with probable cause to administer a PBT and to arrest Stewart for the open-container violation. *See, e.g.*, *Branch v. Gorman*, 742 F.3d 1069, 1072-73 (8th Cir. 2014) (finding that police had probable cause to arrest an occupant of a vehicle for violating the open-container law where she had been sitting in the passenger seat in the immediate vicinity of a flask that had a strong odor of alcohol, stating that "[c]ourts routinely find probable cause under open-container laws when police officers observe empty bottles in vehicles"); *United States v. Wilkins*, No. 1:12CR261, 2012 WL 3871942, at *5 (N.D. Ohio Sept. 6, 2012) (finding probable cause for open-container violations by a passenger where the passenger smelled of alcohol and had a cup of caramelized beverage, which smelled of alcohol, half stashed underneath his seat); *Perkins v. United States*, 936 A.2d 303, 306-09 (D.C. 2007) (concluding that the police had probable cause to arrest a vehicle occupant for violating the open-container law, based on his proximity as a front-seat passenger to an open can of malt liquor in the center console).

Given this finding of probable cause, no reasonable jury could find in Stewart's favor on a Fourth Amendment claim arising out his being subjected to a PBT and issued a citation for violation of Indiana's open-container law.

### B. Stewart's § 1983 False Arrest Claim Against the City

Reading Stewart's complaint generously, Stewart alleges a § 1983 false arrest claim against the City in his operative complaint, contending that his false arrest was the result of

Defendants' "practices, policies, acts, and/or omissions[.]"[9] (DE 73 at 3); *see generally Cui v. Elmhurst Police Dep't*, No. 14 C 8330, 2015 WL 237525, at *3 (N.D. Ill. May 14, 2015) (explaining that a plaintiff's failure to allege an official policy or custom dooms his § 1983 constitutional claims against the city). In his motion for summary judgment, Stewart argues that he was charged with a violation of the open-container law due to "racial profiling" and "discrimination" by the Officers based on his "religion, color, and sex." (DE 104-1 at 4). Specifically, Stewart, who is black, contends that he was charged with the open-container violation after he told the Officers that he was "Moorish American." (DE 73 at 2; DE 104-1 at 4). He also questions why he, but not Natasha, was subjected to a frisk, a PBT, and a citation for violation of the open-container law. (DE 73 at 2-3; DE 104-1 at 3-4).

A plaintiff suing a municipality under § 1983 must show that his harm was caused by a municipal policy or custom. *See Monell*, 546 U.S. at 694; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). More specifically, Stewart must show that his constitutional violation was "caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 799 (7th Cir. 2016) (citation and internal quotation marks omitted). Stewart bears the burden at the summary judgment stage of "sett[ing] forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (citation and internal quotation marks omitted). Stewart cannot meet this burden "by creating some metaphysical doubt as to the material facts, by conclusory

---

[9] A municipality may not be held liable on a § 1983 claim solely on a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (2000).

allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Hodge v. Parker*, No. 1:05-cv-1776-DFH-TAB, 2008 WL 3411682, at *5 (S.D. Ind. Aug. 8, 2008); *see Zaborowski v. Dart*, No. 08 C 6946, 2011 WL 6660999, at *10 (N.D. Ill. Dec. 20, 2011).

Here, Stewart relies solely on conclusory allegations and unsubstantiated assertions about discrimination based on his religion, race, or gender to support his motion for summary judgment. This is insufficient, as "[a] party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) (citation omitted).

Moreover, as to Stewart's complaint that he and Natasha were treated disparately, Stewart does not dispute the testimony of Officers Hughes and Hensler that Stewart had the odor of alcohol on his breath, and that when Officer Hughes approached the vehicle, he observed Stewart reaching in the area where open containers were discovered, which Officer Hughes reasonable interpreted as furtive movements. Nor does Stewart dispute that he had alerts attached to his name notifying officers that he was a known resistor and that he had been denied a handgun permit. As such, Stewart and Natasha are not similarly situated, dooming Stewart's § 1983 false arrest claim against the City. Consequently, on this record, no reasonable jury could conclude that a purported City custom or policy of discrimination based on religion, race, or gender was the "moving force" behind Stewart's constitutional deprivation. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 306-07 (7th Cir. 2010). For these reasons, the City is entitled to summary judgment in its favor on Stewart's claims of false arrest.

### C. Stewart's State-Law False Arrest Claims

Stewart also contends that the Officers are liable for his alleged false arrest under Indiana

law, and that the City is liable for the Officers' actions under a theory of *respondeat superior*. (*See* 73 at 4). Stewart's false-arrest claims advanced under state law, however, are easily disposed of.

The elements of a federal claim and an Indiana claim for false arrest are essentially identical. *See Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009); *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003) ("[B]oth Indiana and federal law require the court to determine if there was probable cause for arrest, and both base the probable cause determination on whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense."). Therefore, for the reasons already articulated *supra* with respect to Stewart's § 1983 false arrest claims, Stewart's false-arrest claims under Indiana law fail as well.[10]

### D. Stewart's Discrimination Claims Against the Officers

Stewart also claims in his complaint that the Officers discriminated against him based on his religion. In his motion for summary judgment, Stewart expands his allegations to include discrimination based on his race and gender as well. As such, Stewart appears to be advancing an equal protection claim under the Fourteenth Amendment, which protects individuals from discriminatory administration and enforcement of the law.

In a traditional equal protection claim, a plaintiff must show that: (1) he is otherwise similarly situated to members of the unprotected class; (2) he was treated differently from

---

[10] Furthermore, Stewart failed to comply with the notice provision of the Indiana Tort Claims Act. *See* Ind. Code § 34-13-3-8. Therefore, Stewart's state-law false arrest claims are barred on procedural grounds as well. *See, e.g.*, *Garcia v. City of East Chi. Common Council*, No. 2:16-CV-321-RL-PRC, 2017 WL 1325429, at *2 (N.D. Ind. Apr. 10, 2017).

members of the unprotected class; and (3) the defendants acted with discriminatory intent. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). In a "class of one" equal protection claim, a plaintiff must offer evidence that the defendants "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010) (citation and internal quotation marks omitted). "To be considered 'similarly situated,' a plaintiff and his comparators (those alleged to have been treated more favorably) must be identical or directly comparable in all material respects." *Id*. (citation omitted).

Stewart's assertion of discrimination based on race and religion are non-starters, as there is no evidence that Natasha, who he claims was treated more favorably, was of a different race or religion than Stewart. Likewise, Stewart's assertions of discrimination based on gender fail too, as no jury could reasonably conclude that Natasha was otherwise similarly situated to Stewart in all material respects. *See id*. As already explained, it is undisputed that Stewart had the odor of alcohol on his breath; that when the Officers approached the vehicle, they observed Stewart reaching in the area where they discovered the open containers, which they reasonably interpreted as furtive movements; and that Stewart had alerts attached to his name notifying officers that he was a known resistor and that he had been denied a handgun permit. These same facts doom any "class of one" equal protection claim, as they provide a "rational basis for the difference in treatment" between Stewart and Natasha by the Officers. *Id.*

Consequently, on this record, no reasonable jury could conclude in Stewart's favor on his assertions of discrimination against Stewart by the Officers. Therefore, Defendants' motion for summary judgment will be granted in its entirety, and all of Stewart's claims will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (DE 100) is GRANTED as to all of Stewart's claims, and Plaintiff's motion for summary judgment (DE 104) is DENIED.  Defendants' motion to strike (DE 107) is DENIED AS MOOT, and Plaintiff's motion in opposition to Defendants' motion to strike is DEEMED MOOT (DE 108).  The Clerk is DIRECTED to enter a judgment in favor of Defendants and against Stewart.

SO ORDERED.

Entered this 20th day of February 2019.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge